# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIFFANY BLACKWELL, | CASE NO. 06cv0307 DMS (AJB) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |
| vs. | |
| SKYWEST AIRLINES, INC; and DOES 1 through 100 inclusive, | |
| Defendant. | |

In this action, Plaintiff Tiffany Blackwell brings suit against her former employer, Defendant SkyWest Airlines, Inc. ("SkyWest"), alleging multiple violations of California's wage and hour laws. Pending before the Court is SkyWest's motion for summary judgment, and in the alternative, summary adjudication of eighteen separate issues relating to eight of nine claims for relief asserted by Blackwell against SkyWest. (Doc. 100.) The matter was fully briefed and argued before the Court on October 17, 2008, with Gregg Lander appearing on behalf of Blackwell and Amanda Sommerfeld and Patricia Stambelos appearing on behalf of SkyWest. For the foregoing reasons, the Court DENIES SkyWest's motion for summary judgment and GRANTS in part and DENIES in part its motion for summary adjudication.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

# BACKGROUND

Blackwell worked for as a customer service representative for SkyWest at its Palm Springs, California station from November 29, 2002 until December 1, 2004.[1] (Undisputed Material Fact, "UMF," 8.) SkyWest customer service representatives who interact with the public at stations are referred to as Frontline Agents ("Agents"). (UMF 15.) Specifically, Blackwell was employed as a Cross-Utilized Agent from November 29, 2002 to May 2004, and thereafter as a Baggage Service Agent. (UMF 28.) Cross-Utilized Agents are used in smaller SkyWest stations, such as Palm Springs, and their duties run the gamut from providing passenger assistance at ticketing and boarding, baggage handling and locating, marshaling aircraft into and out of gates, and coordinating operations between other Agents, Air Traffic Control and the airplanes themselves. (UMF 16-22.) Blackwell was responsible for servicing 10 to 30 flights per day. (UMF 30.) As a Baggage Service Agent, Blackwell assisted passengers with lost or damaged baggage, and was called upon to occasionally assist other Agents with ticketing and boarding duties. (UMF 32-33.)

SkyWest is "the world's largest independently owned" regional air carrier. (UMF 1.) It provides service to 152 North American cities, including 38 states, 5 Canadian Provinces, and Mexico. (UMF 3.) It provides air service to 36 stations in California. (UMF 7.) It has over 1,000 scheduled daily departures, and in 2007, it carried 22.1 million passengers for 11.6 billion revenue miles. (UMF 4-5.) Its business model is based primarily on operating commercial flights under contract for other carriers, United Airlines ("United"), Delta Airlines ("Delta"), and Midwest Airlines ("Midwest"). (UMF 2.) Under these multi-year "carrier contracts," SkyWest provides air and ground service for the other carrier's routes. (UMF 42.) Carrier contract flights account for 94% of SkyWest's business, for which SkyWest is paid a set amount per flight, not including fuel, fees, and aircraft equipment costs. (UMF 41, 47.) SkyWest, however, must cover its own labor and maintenance costs. (UMF 49.) In the last six months, SkyWest has lost carrier contracts for 16 stations in 11 states due to increased labor costs. (UMF 59.) Non carrier contract flights, or "prorate flights" account for the remainder of

---

[1] Blackwell also worked for SkyWest at its Santa Maria and San Luis Obispo stations, from August 2, 2000 until November 29, 2002, but this work was performed outside of the relevant limitations period. (Blackwell Decl. ¶3; UMF 10.)

SkyWest's business.  (UMF 51.)  SkyWest receives revenue on "prorate flights" based on the number and amount of fares it sells to passengers, and it selects which routes to serve with prorate flights based primarily on profitability.  (UMF 54-55.)

During her employment with SkyWest, Blackwell was a member of the SkyWest Airlines' Frontline Association (SAFA).  (UMF 60.)  SAFA is an employee association that purports to represent Agents in negotiations with SkyWest over issues relating to pay, employee discipline, and work hours and rules.  (UMF 68.)  SAFA and its predecessor entities have represented Agents since 1988. (UMF 62.) SAFA and SkyWest memorialize the results of their negotiations in writing (UMF 66), in documents known as Standard Practices (SP's).  (Tate Decl. ¶15).  The parties dispute the significance of the SP's and the negotiations preceding them.

Blackwell asserts nine state law claims against SkyWest in her First Amended Complaint (FAC): (1) failure to pay straight time wages; (2) failure to pay minimum wages; (3) failure to pay overtime wages; (4) failure to provide meal periods; (5) failure to provide paid rest periods; (6) violations of Cal. Labor Code §221 (illegal paycheck deductions); (7) violations of Cal. Labor Code §203 (waiting time penalties); (8) unfair business practices under Cal. Bus. & Prof. Code 17200 et seq.; and (9) declaratory relief pursuant to Cal. Civ. P. Code §1060.  (FAC, Doc. 86).

In the instant motion, SkyWest asks the court to enter summary judgement in its favor on claims One through Eight, or in the alternative, summary adjudication as to the following issues:

(1) Whether the first and second claims for relief are without merit because SkyWest paid Blackwell for all hours worked and she has insufficient evidence of damages (issues 1 and 2);

(2) Whether the third claim for relief fails as a matter of law because SkyWest is exempt from paying overtime under state law, where as here Blackwell is an employee covered by a CBA entered into and pursuant to the RLA (issues 3 and 4);

(3) Whether the third, fourth, and fifth claims for relief are preempted by the RLA, because resolution of the claims would require this Court to interpret the CBA (issues 5-7);

(4) Whether the fourth and fifth claims for relief are preempted by the Airline Deregulation Act (ADA) (issues 8 and 9);

(5) Whether the enforcement of state law underlying the third, fourth, and fifth claims for relief

would violate the Commerce Clause of the United States Constitution (issues 10-12);

(6) Whether Congress' regulation of the airline industry is so pervasive as to preempt the field, thus barring the third, fourth, and fifth claims for relief (issues 13-15);

(7) Assuming Blackwell is able to recover on her sixth claim for relief, whether SkyWest is entitled to offset travel benefits conferred on Blackwell to avoid unjust enrichment (issue 16);

(8) Whether the seventh claim for waiting time penalties is without merit because SkyWest does not owe Blackwell any wages, and whether such penalties are precluded by the presence of a good-faith dispute over whether wages are due (issues 17 and 18); and

(9) Whether the eighth claim for relief fails because of the other claims upon which it is based fail, and whether it is preempted by the ADA (issue 19). (Mot., Doc. 100, at 2-5.)

## II.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where there is an absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattrett,* 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to meet this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts."

1   *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).   Rather, the

2   nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the

3   depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that

4   there is a genuine issue for trial.'"   *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).   "Disputes

5   over irrelevant or unnecessary facts will not preclude a grant of summary judgment."   *T.W. Elec. Serv.,*

6   *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).   Moreover, "the district

7   court may limit its review to the documents submitted for the purposes of summary judgment and

8   those parts of the record specifically referenced therein."   *Carmen v. San Francisco Unified Sch. Dist*.,

9   237 F.3d 1026, 1030 (9th Cir. 2001).   The court is not obligated "to scour the record in search of a

10   genuine issue of triable fact."   *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir, 1996) (citation omitted.)

11   When making its determination, the court must view all inferences drawn from the underlying facts

12   in the light most favorable to the party opposing the motion.   *See Matsushita,* 475 U.S. at 587.

13   "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from

14   the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary

15   judgment."   *Anderson*, 477 U.S. at 255.

16          "If summary judgment is not rendered on the whole action, the court should, to the extent

17   practicable, determine what material facts are not genuinely at issue."   Fed. R. Civ. P. 56(d)(1).   Under

18   Rule 56(d), the court may grant summary judgment on less than the non-moving party's whole claim.

19   *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir. 2002).

20   Partial summary judgment is a mechanism through which the Court deems certain issues established

21   before trial.   *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981).   "The procedure was

22   intended to avoid a useless trial of facts and issues over which there was really never any controversy

23   and which would tend to confuse and complicate a lawsuit."   *Id.*   Even if a party is not likely to prevail

24   on one of its claims, "the Court may still grant summary adjudication as to specific issues if it will

25   narrow the issues for trial."   *First Nat'l Ins. Co. v. FDIC*, 977 F. Supp. 1051, 1055 (S.D. Cal. 1997).

26   Upon ruling, the court "should . . . issue an order specifying what facts – including items of damages

27   or other relief – are not genuinely at issue."   Fed. R. Civ. P. 56(d)(1).

28   / / /

**III.**

**DISCUSSION**

SkyWest initially moves the Court for summary judgment, which motion is denied for the reasons set forth below.  In the alternative, SkyWest moves for summary adjudication of eighteen issues on grounds that there are no genuine issues of material fact and it is entitled to adjudication of the issues as a matter of law.  These issues are discussed in turn.

**A.      Issues 1 and 2:  Blackwell's First and Second Claims for Relief**

In her first and second claims for relief, Blackwell alleges SkyWest failed to pay her straight time wages and a minimum wage for hours she worked.  (FAC ¶¶19-33.)  California Labor Code § 204, and various wage orders promulgated by California's Industrial Wage Commission (IWC), establish an employee's right to be paid for all hours worked.  California Labor Code § 1197 makes it unlawful to pay less than the minimum wage for hours worked.  Blackwell contends that SkyWest consistently required her to perform off-the-clock work prior to the beginning of her shift, during her lunch hour, and after her shift ended.  (Barnes Decl, Ex. A, Blackwell Decl., "Blackwell Decl.", ¶¶30-31.) Further, according to Blackwell, SkyWest adopted a computerized timekeeping system in January 2002, under which the system automatically recorded her meal period, even when she worked through her meal period and never took a break.  (*Id.* at ¶¶38-39.)  Blackwell estimates that she worked off-the-clock at least three hours per week.  (*Id.* at ¶¶32.)

Skywest argues that there are no genuine issues of material fact regarding these claims.  First, SkyWest argues that summary adjudication is proper because it paid Blackwell for all hours worked, and employers can be held liable only "if the employer knows or should have known the employee was working off the clock," citing *Brinker Rest. Corp. v. Super. Ct.*, 165 Cal. App. 4th 25, 60 (2008), *Morillon v. Royal Packing Co.,* 22 Cal.4th 575, 585 (2000), and *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 313 (9th Cir. 1981).  However, less than a week after the Court heard oral argument on the present motion, *Brinker* was depublished, pending review before the California Supreme Court.  *See* 2008 Cal. LEXIS 12467 *1 (October 22, 2008).  *Morillon* and *Forrester* also do not assist SkyWest as they are distinguishable.  *Morillon* drew on *Forrester,* a case involving overtime pay under the Fair Labor Standards Act § 207, to construe whether under IWC Wage Order No. 14-80

agricultural workers were required to be compensated for time spent on employer-provided transportation. *See* 22 Cal.4th at 585. Blackwell's claims – relating to a failure to pay regular or minimum wage for hours worked in the airline industry – raise different issues.

Blackwell correctly argues that, even if *Brinker* remained good law, her testimony creates a genuine issue of material fact. She testified by declaration that: (a) SkyWest consistently instructed her to work off the clock and did not pay her straight time wages for each and every hour that she worked, (Blackwell Decl. ¶¶ 31, 33); (b) SkyWest had a policy whereby an automatic 30 minute deduction for a meal period was reflected in her time records, (*Id.* at ¶ 38); and (c) SkyWest did not have a system to record actual meal time breaks. (*Id.* at ¶39.) In addition, Blackwell complained to a supervisor regarding particular instances where her time-cards incorrectly reflected a meal period had been taken. (Blackwell Dep. 415;12-416:10.) According to Blackwell, her supervisor agreed to investigate and correct any underpayment. (*Id.* at 419:9-24.) However, her supervisor testified that while Blackwell informed him from time to time that she "had not taken a meal period during a shift," Blackwell never complained to him "that she worked off the clock." (Sanchez Decl. ¶¶ 8, 9.) Her supervisor admitted that Blackwell stated her paycheck was incorrect on a "few occasions," but that "he investigated each instance . . . and ensured that [Blackwell] was properly paid." (*Id.* at ¶ 11.) A triable issue of fact exists as to whether Blackwell was in fact paid for every hour she worked. Resolution of this issue necessarily involves credibility determinations that preclude summary adjudication. *Anderson*, 477 U.S at 255 ("Credibility determinations . . . are jury functions, not those of a judge.")

Second, SkyWest argues that the first and second claims fail because Blackwell has produced insufficient evidence of damages. It cites *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) (superseded by statute on other grounds), for the proposition that an employee bears the burden of producing "sufficient evidence of the amount and extent of overtime worked so that a just and reasonable inference can be made as to the amount of damages owed." *Id.* at 687. Blackwell's testimony that "she worked off the clock approximately three hours in any given week," is broad, unspecific, and self-serving. As noted, however, Blackwell testified that SkyWest maintained inaccurate time records, because it did not record work performed during automatically-deducted meal

1    time periods.  (Blackwell Decl. ¶¶ 39-41.)  Under such circumstances, the *Mt. Clemons Pottery*

2    standard does not bar Blackwell's claims.  *See Reeves v. Int'l Tel. and Tel. Corp.*, 616 F.2d 1342, 1351

3    (9th Cir. 1980) (construing *Mt. Clemons Pottery* and holding employer should not be rewarded by

4    failure to maintain adequate time records).  SkyWest's motion regarding these claims is therefore

5    denied.

6    **B.      Issues 3 and 4: Blackwell's Third Claim for Relief and IWC Order 9**

7            Blackwell's third claim for failure to pay overtime is premised on two alleged violations of

8    California law. (FAC ¶¶34-41.)  First, Blackwell argues that SkyWest did not pay her daily overtime

9    wages when she worked pursuant to an alternative workweek schedule because SkyWest never

10   complied with IWC Wage Order 9, which governs the adoption of alternative workweek schedules.

11   (Opp. at 3.)  Under Wage Order 9, an alternative workweek schedule is one where an employee is

12   permitted to work no more than 10 hours per day within a 40 hour workweek before overtime

13   compensation is due.  Wage Order 9 specifies prerequisites that must be met before alternative

14   workweek schedules can be employed, including a written proposal, secret ballot elections by

15   employees, and timely reporting to California regulators.  *See* Cal. Code Regs., tit 8 §11090(3)(C) .

16   Second, Blackwell argues that SkyWest's failure to pay daily overtime on "shift trades" violates Wage

17   Order 9.  (Opp. at 5.)  Agents are permitted to voluntarily trade shifts with each other, but Blackwell

18   complains SkyWest does not pay daily overtime for these "shift trades."  (Blackwell Decl. ¶¶48-49.)

19           SkyWest contends that Blackwell's claim fails because SkyWest and its Agents entered into

20   a collective bargaining agreement ("CBA") pursuant to the Railway Labor Act ("RLA"), 45 U.S.C.

21   151-88, and thus Wage Order 9 exempts SkyWest from paying Agents either daily overtime or shift

22   trades overtime.  (Mot. at 9.)  Blackwell argues the following triable issues of fact preclude summary

23   adjudication: (1) SAFA is not a valid representative under the RLA, (Opp. at 10); (2) the SP's do not

24   constitute a CBA, (Opp. at 14); and (3) Blackwell's shift trade claims are not exempt under Wage

25   Order 9, (Opp. at 33).[2]  The Court disagrees for the following reasons.

26   / / /

27

28           [2] Neither party disputes whether SkyWest is an interstate air carrier as defined by the RLA.
     *See* 45 U.S.C. § 151, First (defining carrier), and § 181 (extending RLA to interstate air carriers).

*1.     SAFA is a Representative under the RLA*

SkyWest contends that SAFA is the exclusive representative of Agents, such as Blackwell, for purposes of negotiating "wages, hours, work rules and fringe benefits." (Mot. at 10.)  Blackwell disagrees, arguing that SAFA does not constitute a "representative" under the RLA.  (Opp. at 10.)

At the "heart" of the RLA,

> is the duty, imposed by [45 U.S.C. § 152, First], upon management and labor, 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.'

*Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377-378 (1969).  Disputes between carriers and employees "shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer."  45 U.S.C. § 152, Second.  The RLA defines the term "representative" to mean "any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them."  45 U.S.C. §151, Sixth.  Representatives are designated "by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other." *Id.* at § 151, Third.  "There are no qualifiers attached to the [RLA's] simple definition of 'representative.'  The 'representative' of a craft of employees is, simply, a person or union designated to act on their behalf, to accomplish what they seek to accomplish, and is not necessarily a man for all seasons." *Russell v. National Mediation Bd.*, 714 F.2d 1332, 1341 (5th Cir. Tex. 1983).  A majority of employees in a craft or class "shall have the right to determine who shall be [their] representative." *Id.* at § 151, Fourth.  Nevertheless, the RLA's stated purposes include: "provid[ing] for the complete independence of . . . employees in the matter of self-organization to carry out" their role under the RLA.  45 U.S.C. § 151a.  *See also Russell,* 714 F.2d at 1343 (RLA "supports but does not require collective bargaining . . . and [implicit] throughout the Act is that the 'complete independence' of the employees necessarily includes the right to reject collective representation.").

Here, SkyWest offers testimony from James Boyd, SkyWest's Vice President of Customer Service, and David Tate, President of SAFA.  Both testify that all of SkyWest's Agents are represented by SAFA (UMF 60); SAFA or a predecessor have represented Agents since 1988 (UMF 62); SAFA

1   negotiates with SkyWest on issues including base and incentive pay, disciplinary rules and review,

2   work hours and work rules (UMF 65); and SAFA and SkyWest recognize SAFA as the Agents'

3   exclusive representative.  (UMF 80.)  Boyd further states that "SAFA's predecessors were formed by

4   the Frontline Agents, and not SkyWest."  (Doc. 100-9, Boyd Decl. ¶3.)  Tate states that he is not aware

5   of any other organization seeking to represent Agents, and the Agents themselves have not sought

6   "representation or organization by any other group."  (Doc. 100-6, Tate Decl. ¶11.)

7        Blackwell attempts to controvert these facts by testifying that she was not a member of a dues-

8   paying union while at SkyWest, she never authorized any "person or group to be my representative in

9   terms of bargaining for or negotiating for my wages, benefits, or working conditions," and was never

10  advised that she could "in any way participate in the negotiations."  (Doc. 104-2, Blackwell Decl. ¶¶4-

11  6, 11.)  Under the RLA, however, a "representative" need not be a union.  45 U.S.C. §151, Sixth.

12  Moreover, once SAFA's predecessors were chosen by the Agents,[3] the organization was "thus chosen

13  to represent all of its members, regardless of their union affiliations or want of them." *Steele v.*

14  *Louisville & N. R. Co.*, 323 U.S. 192, 200 (1944).  The designation of a representative, coupled with

15  the duty to bargain in 45 U.S.C. § 152, First, "operates to exclude any other from representing a craft,"

16  and members "are thus deprived by the statute of the right, which they would otherwise possess, to

17  choose a representative of their own, and its members cannot bargain individually on behalf of

18  themselves as to matters which are properly the subject of collective bargaining." *Id*.  Following the

19  Agents' designation of SAFA and its predecessor organizations as their representative, no requirement

20  exists under the RLA that Agents vote periodically to redesignate SAFA as their representative.

21  Indeed, such a requirement would run contrary to the RLA's stated purpose in 45 U.S.C. § 151a of

22  providing employees "complete independence" to self-organize.  Finally, Blackwell was precluded

23  from participating in negotiations because she was not a designated representative.  *See Aircraft*

24  *Mechanics Fraternal Ass'n v. Northwest Airlines Corp.*, 394 F.Supp.2d 1082, 1088 (D. Minn. 2005)

25  (employee observers not members of negotiating committee held not to be representatives and subject

26  to bar from proceedings).

27  _____

28      [3]   Although SkyWest did not produce evidence of an election by Agents, it did produce
uncontroverted evidence that Agents formed SAFA's predecessors and designated them to be their
representative, and since then, Agents have not challenged SAFA's role as their representative.

1    Blackwell also challenges SAFA's representative status on grounds that SAFA is "nothing

2    more than a company union." (Opp. at 11.) Under the RLA, a carrier is prohibited from interfering,

3    influencing, or coercing employees in the designation of representatives or attempts to self-organize.

4    45 U.S.C. § 152, Fourth.   A carrier also may not use its funds "in maintaining or assisting or

5    contributing to any labor organization, labor representative, or other agency of collective bargaining."

6    *Id.* Blackwell directs the Court's attention to SAFA's by-laws, which were attached to SkyWest's

7    moving papers, and advances several inferential arguments to show SkyWest's interference with

8    SAFA: (1) because SAFA board members' positions are "full-time" and SAFA does not collect dues,

9    Blackwell argues that board members are paid exclusively by SkyWest "to do nothing more than

10   conduct union or 'association' business" (*Id.*, at 11-12); (2) SAFA board members are required to

11   travel and meet with Agents at each station, but this travel is subsidized entirely by SkyWest (*Id.*, at

12   12); (3) SAFA executive board members are SkyWest managerial employees because under SAFA

13   by-laws, board members are "full-time exempt" employees (*Id.*); and (4) SAFA board members are

14   not voted on by Agents, but are selected by existing board members, working in conjunction with

15   SkyWest's personnel department.  (*Id.*)

16   SkyWest directs the Court to evidence that demonstrates arm's length collective bargaining

17   between SAFA and SkyWest.  SAFA President Tate's testimony details various negotiations where

18   SAFA realized changes in Agents' working conditions, including incentive pay programs, time-

19   keeping policies favorable to non-exempt employees, employee participation in disciplinary reviews,

20   pay scale changes, compensation for random drug testing, attendance policies, and seniority

21   qualifications.  (Tate Decl. ¶¶19-22.)  SkyWest cannot dissolve SAFA, and does not oversee it, or

22   control its communications with members.  (*Id.*, at ¶¶5-8.) SkyWest also points out that it is obligated

23   under the RLA to pay SAFA board members wages for the time they confer with SkyWest and may

24   pay SAFA board members' transportation costs while they are engaged in representational duties.  45

25   U.S.C. § 152, Fourth.

26   SkyWest argues that Blackwell's arguments do not address the proper standard for carrier

27   interference.   Because the RLA encourages cooperation and support, SkyWest contends the

28   appropriate "question is whether the assistance provided the union [by a carrier] is in fact depriving

1   employees their freedom of choice.  It is not the potential for but the reality of domination that these

2   statutes are intended to prevent." *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1016 (9th Cir.

3   1990).  This subjective inquiry looks to

4          whether the organization exists as the result of a choice freely made by the employees,
           in their own interests, and without regard to the desires of their employer or whether
5          the employees formed and supported the organization, rather than some other, because
           they knew their employer desired it and feared the consequences if they did not.

6

7   *Hertzka and Knowles v. N.L.R.B.*, 503 F.2d 625, 630 (9th Cir. 1974).

8          The question, therefore, is whether SkyWest's assistance to SAFA is "aimed at undermining

9   the employees' right to organize and to elect labor representatives and ultimately aimed at formation

10  of company-dominated unions, the illegal purpose which Congress sought to prevent in enacting the

11  [RLA]." *Barthelemy*, 897 F.2d at 1015.  As opposed to cooperative efforts, the RLA "prohibit[s] only

12  such use of the company union as . . . was enjoined in the *Railway Clerks Case*." *Virginian Ry. Co.*

13  *v. System Federation No. 40, et al.,* 300 U.S. 515 (1937)   In the *Railway Clerks Case,* there was

14  undisputed evidence that the carrier developed, funded, and promoted an employee association to

15  further the carrier's interests and supplant a labor union that currently represented employees. *Texas*

16  *& N.O.R. Co. v. Brotherhood of Ry. & S.S. Clerks (Railway Clerks Case)*, 281 U.S. 548, 560 (1930).

17  Based on that evidence, the Court upheld the lower courts' conclusion that the carrier's activities

18  "constituted an actual interference with the liberty of the clerical employees in the selection of their

19  representatives." *Id*.  Although the evidence before the Court suggests interdependence between

20  SAFA and SkyWest, there is no evidence that Agents have been deprived of their liberty to organize

21  or select a representative other than SAFA.  To the contrary, it is undisputed that Agents designated

22  a SAFA predecessor as their representative (Boyd Decl. ¶3, UMF 62), and no representational disputes

23  have emerged since then (Tate Decl. ¶11).  In light of the undisputed evidence and applicable legal

24  standards, the inferences that Blackwell draws are unjustifiable.  *See Anderson,* 477 U.S. at 255.

25          2.      *The Standard Practices ("SP's") are a Collective Bargaining Agreement ("CBA")*

26          SkyWest argues that the SP's negotiated by SAFA and itself form a CBA under 45 U.S.C. 151,

27  First ("agreement[] concerning rates of pay, rules, and working conditions.").  (Mot. at 11.)  It

28  advances the following undisputed facts: (1) SkyWest and SAFA bargain to agreement on wages,

hours, work rules, and fringe benefits (UMF 81); (2) those negotiations are conducted in person, by SkyWest and SAFA representatives (UMF 82); (3) SkyWest and SAFA have successfully negotiated in this manner since 1988 (UMF 62); (4) the agreement is memorialized in writing (UMF 83); (5) SAFA executive board ratifies any negotiated changes on behalf of its members (UMF 84); and (6) SkyWest has never unilaterally deviated from or made alterations to the SP's (UMF 85).  Blackwell contends that the SP's are not a CBA, but rather a "run-of-the-mill employee policy manual" because the evidence does not show mutual assent to be bound.  (Opp. at 15.)  It notes that SkyWest took a seemingly inconsistent position in its opposition to Plaintiff's motion for class certification: "SkyWest issues [SP's] and Policy Manuals that are guides for station managers.  However, station managers are given discretion to vary from these guidelines." (Opp. at 15-16.)

The Ninth Circuit employs "general contract principles adapted to the collective bargaining context to determine whether the two sides have reached an agreement."  *Warehousemen's Union Local No. 206 v. Continental Can Co., Inc.*, 821 F.2d 1348, 1350 (9th Cir. 1987).  A court may look to "the surrounding circumstances and the intentions of the parties to determine if a collective bargaining agreement exists."  *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1504 (9th Cir.1984).  Here, the undisputed evidence shows mutual assent by SAFA and SkyWest to bargain on "rates of pay, rules, and working conditions," and to memorialize their agreements in writing.  Tate's testimony establishes SAFA's intent to be bound when negotiating.  (Tate Decl. ¶15 (when SAFA negotiates with SkyWest it "intends to form a binding contract.")) SkyWest' intent to be bound is evidenced by the fact that it has never unilaterally deviated from the SP's.  (UMF 85.)  Moreover, SkyWest's previous position that station managers have discretion to vary from the SP's, is not contrary to this conclusion.  Because the SP's are silent regarding the discretion exercised by station managers, this raises, at most, a question regarding the contract's terms and whether such terms were breached – not whether SAFA and SkyWest formed a valid contract.  Here, the undisputed evidence establishes a contract was formed in the first instance.

    3.    *Wage Order 9*

Wage Order 9 section (1)(E) exempts employers from California overtime wage requirements if their "employees . . .  have entered into a collective bargaining agreement under and in accordance

1   with the [RLA], 42 U.S.C. Sections 151 et seq." *See Fitz-Gerald v. SkyWest Airlines, Inc.,* 155

2   Cal.App.4th 411, 419 (Cal.App. 2 Dist. 2007) (holding SkyWest exempt from paying flight attendants'

3   overtime wages). Because the Court finds that SkyWest is a interstate carrier, SAFA represents

4   SkyWest's Agents, and SkyWest and SAFA formed a valid CBA pursuant to the RLA, SkyWest is

5   exempt from state overtime laws.

6       Blackwell nevertheless contends that to the extent her overtime claim is premised on failure

7   to pay overtime for work during "shift-trades" with other employees, Wage Order 9 section (3)(N)

8   does not exempt SkyWest from paying such overtime accrued on a daily, as opposed to weekly, basis.

9   Section (3)(N) exempts airline employees who work more than 40 hours but less than 60 hours a week

10  due to "temporary modification in the employee's normal work schedule . . . arranged at the request

11  of the employee." This argument is unavailing. Although section (1)(E) carves out some sections of

12  Wage Order 9, namely "Sections 4, 10, 11, 12, and 20 through 22," it makes no such exception for

13  section (3)(N).

14      Blackwell further argues that Wage Order 9 is invalid, because the Industrial Wage

15  Commission exceeded its rulemaking authority by issuing an order contrary to the express will of the

16  California legislature as evidenced by the Eight Hour Day Restoration and Workplace Flexibility Act,

17  codified at Cal. Labor Code section 500, et seq. This argument is also unavailing. Sections 510 and

18  511 of the California Labor Code establish the 8 hour workday and 40 hour workweek, respectively.

19  Section 514 states that sections 510 and 511 do not apply to employees covered by a valid CBA that

20  provides for "the wages, hours of work, and working conditions of the employees" and overtime and

21  regular pay rates "of not less than 30 percent of the state minimum wage." Because state law disputes

22  are preempted by the RLA if a state court is required to interpret a CBA, the IWC did not exceed its

23  rulemaking authority or act contrary to California Labor Code section 514 by issuing Wage Order 9,

24  section (3)(N), since no California court would have jurisdiction to determine a "regular pay rate."

25  *See* Part III, C, below. Accordingly, SkyWest is exempted from California's overtime requirements

26  under Wage Order 9. SkyWest is entitled to summary adjudication on Blackwell's third claim for

27  relief.

28  / / /

**C.      Issues 5-7: RLA Preemption of Blackwell's Third, Fourth, and Fifth Claims**

As previously discussed, Blackwell alleges in her third claim for relief that she is due overtime compensation. She also alleges in her fourth and fifth claims that SkyWest violated California law by failing to provide mandatory meal and rest periods. (FAC ¶¶42-65.) Pursuant to California Labor Code § 226.7(a), the IWC has promulgated regulations requiring employers to provide employees who work 5 or more hours with a 30 minute meal period, Cal. Code Regs., tit. 8, 11090(11)(A), and a paid 10 minute rest period for every 4 hours of work. *Id.* at 11090(12)(A). Violation of either regulation results in penalties to the employer, payable to the employee, in the amount of "one (1) hour of pay at the employee's regular rate of compensation" for each workday that a meal period or rest period is missed. *Id.* at 11090(11)(D) and 12(B). Blackwell asserts she rarely was provided a legally-compliant meal period: she received no meal period at all, her meal period was less than 30 minutes, or she did not receive her meal period within the first five hours of her shift. (Blackwell ¶35.) Similarly, she contends that she "rarely worked a single day" during which she received all statutorily prescribed rest periods. (*Id.* at ¶42.)

SkyWest contends Blackwell's third, fourth and fifth claims for relief are preempted by the RLA because the Court would have to interpret the SkyWest-SAFA CBA to resolve these state law claims. Blackwell disagrees.

"Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). Congress enacted the RLA "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes. To realize this goal, the RLA establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes." *Id.* at 252 (quoting 45 U.S.C. § 151a). So-called "major disputes" concern "rates of pay, rules or working conditions," and relate to CBA formation or efforts to secure CBAs. *Id.* at 252, 114 S. Ct. at 2244 (quotations and citations omitted). "Minor disputes" arise "out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." *Id.* at 252-53 (quoting 45 U.S.C. § 151a). That is to say, "[m]inor disputes involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Id.* at 253 (quotations and citations

1    omitted).  Because minor disputes must be resolved only through the mechanisms established by the

2    RLA, "a determination that [the plaintiff's] complaints constitute a minor dispute would pre-empt his

3    state-law actions." *Id*.  However, where an employee's claim involves rights and obligations that exist

4    independently of a CBA, there is no need to interpret or apply the CBA, and such a claim is not

5    preempted by the RLA.  *Id.* at 266.

6         SkyWest argues that Blackwell's third, fourth, and fifth claims present "minor disputes."  The

7    CBA addresses Agents' pay, providing pay rates for different work categories, including straight time,

8    supervisor overrides, voluntary shifts, split shifts, holidays, travel, training, jury duty, vacation, and

9    personal user days.  (UMF 86.)  Each work category has its own applicable rules, accrual rates, and

10   differentials based on seniority and location.  (UMF 87.)  Some work categories may overlap, such as

11   "supervisor overrides," when an employee acts as a supervisor, while working a regularly scheduled

12   shift.  (UMF 94.)  In addition, employees are eligible for quarterly bonuses based on individualized

13   performance (number of on-time departures and arrivals, cancelled flights avoided, properly handled

14   baggage) as well as company performance.  (UMF 88, 90.)  Eligibility for bonuses is based on varying

15   seniority requirements, which are detailed in the CBA.  (UMF 92.)  The CBA defines all of these

16   various pay terms, including work categories, pay differentials, and seniority requirements.  (UMF 93.)

17   Implied terms regarding meal and break periods also form part of the CBA.  These terms arise from

18   industry custom and practice, developed in response to federal aviation safety and security mandates

19   issued by the Department of Transportation (DOT), Federal Aviation Administration (FAA),

20   Transportation Safety Administration (TSA), and Department of Homeland Security (DHS).  (UMF

21   107, 119-21.)

22        Given the many applicable pay rates, categories, and differentials, any attempt to determine

23   whether, when, and how much compensation is owed to Blackwell necessarily requires an

24   interpretation of the CBA's provisions.  Similarly, the meal and rest period violations would require

25   an interpretation of the CBA to calculate the penalty for such violations of "one (1) hour of pay at the

26   employee's regular rate of compensation."  *See* Cal. Code Regs. tit 8, section 11090 (11)(D), (12)(B).

27   Therefore, Blackwell's state law claims are preempted as their resolution requires interpretation of the

28   CBA.

1    Blackwell argues that RLA preemption does not apply because the Court need not interpret the

2    CBA to resolve the litigation, as the SP's are not ambiguous, nor is their meaning in dispute.  At most,

3    according to Blackwell, the Court will need to "consult" the CBA as it "is not necessary to *interpret*

4    the 'SPs' to determine whether – as written – they violate California labor laws."[4]  (Opp. 18.)

5    However, the course that Blackwell advocates is contrary to Congressional intent.  A determination

6    of whether the CBA provisions in question violate California law would require this Court to construe

7    the CBA under state law principles, not federal ones.  "Were state law allowed to determine the

8    meaning intended by the parties in adopting a particular contract phrase or term . . . . [t]he parties

9    would be uncertain as to what they were binding themselves to" in a CBA, thereby making agreement

10   more difficult and disputes over the agreement more frequent, and ultimately undermining the purpose

11   of federal labor laws like the RLA. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). *See*

12   *Fitz-Gerald*, 155 Cal.App.4th at 420 (by enacting the RLA, "Congress wanted to avoid having the

13   states apply their own state law principles to interpret a federal labor law collective bargaining

14   agreement, leading to inconsistent results").

15   Blackwell further argues that preemption is inappropriate because her claims rest on statutory

16   violations existing independently of the CBA.  "[A] state-law cause of action is not pre-empted by the

17   RLA if it involves rights and obligations that exist independent of the collective-bargaining

18   agreement." *Hawaiian Airlines,* 512 U.S. at 260.  In addition, a state law claim is not preempted if

19   it relies, in part, on interpretation of the CBA, but also involves a separate and distinct state law

20   analysis, thereby preserving the claim. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413

21   n. 12 (1988).  For example, courts have found that the RLA does not preempt the following categories

22   of state law claims: breach of contract unrelated to a CBA, *Sirois v. Business Express*, *Inc.,* 906 F.

23   Supp. 722, 728 (D. NH 1995); intentional torts, *McCann v. Alaska Airlines, Inc.,* 758 F. Supp. 559,

24   564 (N.D. Cal 1991) (false imprisonment, battery and assault); sexual harassment, *Hirras v. National*

25   *R.R. Passenger Corp.*, 44 F.3d 278, 283–284 (5th Cir. 1995); and discrimination, *Colorado*

26

27   ───────────────

     [4] Blackwell cites *Carmona v. Southwest Airlines Co.,* 536 F.3d 344 (5th Cir. 2008), for support.
28   *Carmona* is inapposite because the case did not consider whether the CBA preempted state law claims, but rather whether the CBA precluded plaintiff's discrimination claims brought under Title VII of the Civil Rights Act and the Americans with Disabilities Act.

1   *Anti–Discrimination Comm'n v. Continental Air Lines, Inc.*, 372 U.S. 714, 724 (1963).

2       Nonetheless, where state law claims are "inextricably intertwined" with the meaning of terms

3 in the CBA, they are preempted. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985); *accord*

4 *Detomaso v. Pan American World Airways, Inc*., 43 Cal.3d 517, 529 (1987) ("RLA preemption must

5 . . . extend to any claim premised on facts inextricably intertwined with matters subject to the

6 grievance procedures of the collective bargaining agreement."). State law claims for overtime pay and

7 vacation time fall into this category, at least where the CBA addresses "those same subjects and the

8 meaning of the statutory language as applied to the terms of the CBA is unclear." *Adames v. Executive*

9 *Airlines, Inc*., 258 F.3d 7, 12 (1st Cir. 2001), cited with approval in *Firestone v. So. Cal. Gas Co.*, 281

10 F.3d 801, 802 (9th Cir. 2002). In such cases, state law "must yield to the developing federal common

11 law, lest common terms in bargaining agreements be given different and potentially inconsistent

12 interpretations in different jurisdictions" *Adames*, 258 F.3d at 12; *Fitz-Gerald*, 155 Cal.App.4th at

13 420.

14       In *Adames,* the First Circuit found that a flight attendant's allegations of overtime and meal and

15 rest period violations "inescapably involved the relationship between various [Puerto Rican] labor laws

16 . . . and certain terms of the CBA addressing the same subject." 258 F.3d at 12. The *Adames* court

17 noted that state law relied on "conventional pay mechanisms, such as hourly wages," while the CBA

18 governing the case displayed the "peculiarities of [airline] industry-specific wage and benefit

19 structures." *Id.* at 12-13. There, plaintiff Adames' claims were governed by at least three different

20 pay rate categories, "flight time," "duty time," and "reserve time." *Id.* at 13-14. Any resolution of her

21 overtime and meal and rest period claims would require a computation of the amount of work

22 conducted under each pay rate category, which necessarily required the court to interpret and apply the

23 CBA terms to determine what pay rate category applied to each purported violation of Puerto Rican

24 law. *Id.* at 13-16.

25       In *Fitz-Gerald*, the California Court of Appeal relied on *Adames*, when it held that the RLA

26 preempted state law claims premised on minimum wage and meal and rest period violations brought

27 by flight attendants against SkyWest. 155 Cal. App. 4th at 420-21. There, the flight attendants' CBA

28 addressed several pay categories and benefits, including "flight pay, block time, overtime, flight

1   standbys and layovers, vacation, and meal/rest breaks." *Id.* at 421.  Moreover, the computation of meal

2   and rest period penalties would require a court to determine "the regular rate of compensation," which

3   was impossible without interpreting the CBA.  *Id.*

4           The situation is no different here.  The SAFA-SkyWest CBA contains express provisions

5   governing overtime, shift trades and meal and rest periods.  SP 93 ("Customer Service Pay Scale")

6   provides that in California overtime applies to hours worked in "excess of eight hours a day, unless

7   an employee is working an approved alternative workweek." (Tate Decl., Ex. B, at 70.)  If so, then

8   overtime is only paid "for hours worked in excess of agreed upon schedule." (*Id.*)  The CBA does not

9   define an "approved alternative workweek," but notes that "alternative schedules may not exceed ten

10  hours in one day." (*Id.*)  It also states that "double time will be paid for hours worked in excess of

11  twelve hours in one day." (*Id.*)  To resolve the overtime claim and calculate wages due Blackwell, the

12  Court would be required to interpret the meaning the terms "approved alternative workweek,"

13  "alternative schedules," and "double time," according to California law.

14          Whether overtime is due on shift trades presents even thornier interpretive problems.  SP 7433

15  ("Station Policies") states that a shift trade occurs when employees trades shifts.  (*Id.* at 86.)  Although

16  no overtime is paid to an employee who initiates a trade, it is paid to an employee who covers another

17  employee's shift.  (*Id.* at 86, 89.)  The CBA specifies detailed criteria that must be met by an employee

18  who chooses or is assigned to cover another employee's shift.  (*Id.* at 89.)  An employee may trade

19  shifts to work a double shift, but the term "double shift" is undefined.  (*Id.* at 87.)  The CBA states that

20  "[n]o more than 60 hours a week and 12 consecutive workdays are permitted," but it is unclear whether

21  this limitation refers to shift trades only or to an employee's total hours worked.  (*Id.*)  To determine

22  overtime due to Blackwell on shift trades, the Court would be required to interpret and apply the

23  CBA's criteria for overtime eligibility, define "double shift," and determine whether the 60 hour

24  workweek or 12 consecutive workday applies only to shift trades or to all hours worked.

25          As to meal and break times, SP 7433 states that a station manager or supervisor is charged with

26  tracking employee break times, and may adjust those times "to maintain proper staffing during

27  unexpected periods of high activity." (*Id.* at 92.)  The SP's are silent on meal and break periods.

28  However, CBA's can include implied terms arising from "practice, usage, and custom." *Hawaiian*

*Airlines*, 512 U.S. at 265 n.10.  Moreover, industry norms acceptable to both sides are often omitted from CBAs.  *Id.*  Disputes over implicit terms, as much as express terms, can qualify as "minor disputes" under the RLA, and thus preempt state law claims.  *Id.* at 264-65.  Here, SkyWest has offered uncontroverted evidence that meal and break periods may conflict with federal aviation safety and security regulations, and that Agents' responsibilities under federal mandates are not optional, nor are they contingent on an Agent's duty status.  (UMF 120.)  To resolve Blackwell's meal and rest period claims, this Court would be required to interpret the implied terms in the CBA, namely, pertinent federal aviation safety and security mandates.

In addition, interpretive issues arise as to the proper calculation of meal and rest period penalties.  SkyWest correctly argues that the calculation of a penalty based on "one (1) hour of pay at the employee's regular rate of compensation" necessarily requires interpretation of the CBA.  In light of the varying pay scales for straight time, overtime, supervisor override pay, and shift trades, the Court necessarily would be required to interpret the CBA to divine Blackwell's "regular rate of compensation."  *See Firestone v. S. Cal. Gas Co.*, 219 F.3d 1063, 1067 (9th Cir. Cal. 2000)  ("[I]f California law were to apply, the parties negotiating the agreement would not know whether the employer's overtime obligations were defined by the contract or not, depending on which rate a court determined was the 'regular' rate under the California law."); *Adames*, 258 F.3d at 15 ("[I]t would be impossible to assess the remedy . . . without interpreting the Agreement to establish what the applicable 'regular' rate would be."); *Fitz-Gerald*, 155 Cal. App. at 421 (same).

Finally, Blackwell argues against preemption on grounds that the alleged statutory violations are non-negotiable rights under state law, and therefore, may not be the proper subject of a CBA, citing *Valles v. Ivy Hill Corp.*, 410 F.3d 1071, 1082 (9th Cir. 2005).  However, as noted by the *Fitz-Gerald* court, *Valles* "do[es] not involve the RLA or an interstate air carrier."  155 Cal. App. at 421.  Indeed, unlike SkyWest, the Ivy Hill Corporation in *Valles* was not a carrier engaged in interstate commerce, but a commercial printer.  Thus, interpretation of the CBA in *Valles* to include nonnegotiable state law based meal and rest periods would not expose Ivy Hill to the problem of "inconsistent interpretations in different jurisdictions," *Adames*, 258 F.3d at 12.  Blackwell's third, fourth and fifth claims for relief are therefore preempted by the RLA.

**D.      Issues 8 and 9: ADA Preemption of Blackwell's Fourth and Fifth Claims**

SkyWest next contends that Blackwell's fourth and fifth claims are preempted by the ADA because they rest on state wage and hour laws that, if enforced, would have the "impermissible force and effect" of regulating SkyWest's routes, services, and prices. *See* 49 U.S.C. § 41713(b)(1) ("a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier"). SkyWest advances two meritorious arguments.

*1.      ADA Preempts State Meal and Rest Period Laws Impacting Service*

SkyWest argues adherence to California's meal and rest period laws would significantly impact its ability to service its passengers and meet obligations under federal security mandates for air carriers. (Mot. at 16.)  It notes that under California Labor Code section 512 and Wage Order 9 employers are generally required to provide their employees with one ten minute rest period for every four-hour period worked and a 30 minute meal period if the employee works more than five hours.  Employers must relieve employees of all duties during those periods.  (*Id.*)  Thus, "these laws not only dictate that employees must be provided with these breaks, they also dictate when these breaks must be given." (*Id.* at 17.)  As such, the application of these laws to SkyWest's Agents, would have the impermissible force and effect of regulating an air carriers "services."  (*Id.*)

Blackwell is dismissive of this "sweeping argument." (Opp. at 23.)  SkyWest's argument, according to Blackwell, boils down to a complaint that it could not profitably compete if forced to comply with California wage and hour laws. (*Id.* at 26.)  Because carriers take into account regulatory costs when determining what markets to services, the "cost of doing business" does not mean SkyWest can ignore the law. (*Id.* at 27-28.)  SkyWest could hire additional employees to make sure its provision of services is uninterrupted, or it could "take its business elsewhere." (*Id.*)

Preemption provisions are narrowly and strictly construed.  *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir. 1998).  When determining whether the ADA expressly preempts Plaintiff's claims, the Court must first "ascertain and give effect to the plain meaning of the language used." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 474 (9th Cir. Cal. 2007) (citations omitted).  Then the Court may "look to the provisions of the whole law . . . and to its object and policy." *Id.* (citations omitted).  "Congress' intent is the ultimate touchstone of every preemption case." *Id.*

1    The ADA contains an express preemption provision, which provides:

2        a State . . . may not enact or enforce a law, regulation, or other provision having the
         force and effect of law related to a price, route, or service of an air carrier.
3

4    49 U.S.C. § 41713(b)(1). Congress' intent in deregulating the airline industry was to "help[] assure

5    transportation rates, routes, and services that reflect maximum reliance on competitive market forces,

6    thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe v.*

7    *New Hampshire Motor Transport Ass'n*, 128 S.Ct. 989, 995 (2008) (quoting *Morales v. Trans World*

8    *Airlines,* 504 U.S. 374, 378 (1992). *See also Charas,* 160 F.3d at 1261 ("Congress intended to

9    preempt only state laws and lawsuits that would adversely affect the economic deregulation of the

10   airlines and the forces of competition within the airline industry."). "To ensure that the States would

11   not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision,

12   prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier."

13   *Morales*, 504 U.S. at 378-379 (quoting 49 U.S.C. § 41713(b)(1)).

14       *Rowe* and *Morales* establish four guiding principles governing ADA preemption: (1) "[s]tate

15   enforcement actions having a connection with, or reference to carrier rates, routes, or services are

16   pre-empted"; (2) "such pre-emption may occur even if a state law's effect on rates, routes or services

17   is only indirect"; (3) "in respect to pre-emption, it makes no difference whether a state law is consistent

18   or inconsistent with federal regulation"; and (4) "pre-emption occurs at least where state laws have a

19   significant impact related to Congress' deregulatory and pre-emption-related objectives." *Rowe,* 128

20   S. Ct. at 995; *Morales,* 504 U.S. at 384, 386-87, 390. Federal law, however, might not preempt state

21   laws that affect fares in "only a 'tenuous, remote, or peripheral . . . manner,' such as state laws

22   forbidding gambling." *Rowe,* 128 S. Ct. at 955 (quoting *Morales*, 504 U.S. at 390.)

23       SkyWest argues that Agents like Blackwell provide "service" as defined by the ADA. As noted

24   earlier, Cross-Utilized Agents such as Blackwell perform various services including passenger

25   assistance at ticketing and boarding, baggage handling and locating, marshaling aircraft into and out

26   of gates, and coordinating operations between other Agents, Air Traffic Control and the airplanes

27   themselves. (UMF 16-22.) Blackwell argues that this definition of "service" is contrary to Ninth

28   Circuit decisional law, which construes the term "service" in reference "to the prices, schedules,

1    origins and destinations of the point-to-point transportation of passengers, cargo, or mail." *Charas,*

2    160 F.3d at 1261.  In the ADA context, "service" refers to "such things as the frequency and

3    scheduling of  transportation, and to the selection of markets to or from which transportation is

4    provided."  *Id.* at 1265-66.  It does not include the "provision of in-flight beverages, personal

5    assistance to passengers, the handling of luggage, and similar amenities."  *Id.*

6       SkyWest urges this Court to recognize that *Rowe* overruled *Charas.*  (Mot. at 12-13.)  In *Rowe*,

7    the Supreme Court relied upon the ADA's preemption clause to interpret an identical provision in the

8    Motor Carrier Act, 49 U.S.C. § 14501(c)(1), to hold that federal law preempted a Maine law requiring

9    retailers to use motor carriers that provide an age verification "service" for tobacco product shipments.

10    *Rowe*, 128 S. Ct. at 993-94.  The Supreme Court concluded that "federal  law must . . . pre-empt

11    Maine's efforts directly to regulate carrier services." *Id.* at 998.  SkyWest directs the Court's attention

12    to a recent Second Circuit case, *Air Transp. Ass'n of Am. v. Cuomo*, which concluded that "*Charas's*

13    approach . . . is inconsistent with the Supreme Court's recent decision in *Rowe*."  520 F.3d 218, 223

14    (2d Cir. 2008).  *Cuomo* held that the ADA preempted New York's "Passenger's Bill of Rights,"

15    because "requiring airlines to provide food, water, electricity, and restrooms to passengers during

16    lengthy ground delays does relate to the service of an air carrier and therefore falls within the express

17    terms of the ADA's preemption provision."  *Id.  Cuomo* joined the majority of circuits, construing

18    "service" as "the provision or anticipated provision of labor from the airline to its passengers" and

19    includes boarding procedures, baggage handling, and food and drink, "matters incidental to and

20    distinct from the actual transportation of passengers."  *Id.* (collecting cases).

21       The Court, however, need not rely on *Rowe* or *Cuomo.  Charas* construes "services" to refer

22    to the "frequency of transportation," particularly "the point-to-point transportation of passengers."

23    Cross-Utilized Agents, such as Blackwell, are responsible for marshaling flights into boarding gates,

24    inspecting and documenting damage to aircraft, and coordinating activity between Air Traffic Control,

25    aircraft, and Agents. (UMF 16-22.) The provision of service is further affected by the following facts:

26    (1) SkyWest often faces "irregular operations," meaning inclement weather, cascading delays, and

27    security alerts can result in Agents working at irregular hours, (UMF 97, 107, 128-40); (2) SkyWest

28    must comply with federal security mandates issued by the Department of Transportation, the FAA and

the Transportation Safety Administration, (UMF 96, 121); (3) pursuant to those federal mandates, Agents are required to perform aviation safety and security duties during the short "turn" time between the arrival and departure of flights, (UMF 23, 105-06, 109-10, 144-45); and (4) carriers coordinate flights to maximize passengers' connection, and the majority of SkyWest's passengers take connecting flights to and from smaller stations and larger hubs prior to arriving at their destinations. (UMF 44-46.) Thus, requiring SkyWest to provide Agents meal and rest periods could result in cascading flight delays, increased risk of death or serious injury to passengers and damage to aircraft, and security breaches. Unlike the activities at issue in *Charas,* 160 F.3d at 1266 ("the pushing of beverage carts, keeping the aisles clear of stumbling blocks, the safe handling and storage of luggage, [and] assistance to passengers in need"), the interruption of Agent activities to accommodate state rest and meal periods could significantly and impermissibly impact point-to-point air carrier service.

### 2. ADA Preempts State Meal and Rest Period Laws Impacting Routes and Prices

SkyWest next argues that the application of the state law underlying Blackwell's claims would have an impermissible significant impact on its routes and prices. It argues that courts have rendered "expansive interpretations" of "routes" and "prices," citing *Morales,* 504 U.S. 374 (state law regulating air carrier advertising had "forbidden significant effect" on pricing) and *American Airlines, Inc. v. Wolens,* 513 U.S. 219 (1995) (state unfair trade practices impermissibly related to prices because it would regulate air carrier frequent flyer programs). It produces the following undisputed facts: (1) assuming that SkyWest failed to provide its Agents with meal and rest periods in the same frequency as Blackwell alleges, its annual labor costs would increase by $3,250,000, (UMF 153); (2) SkyWest would not be able to operate some stations profitably in light of those increased labor costs, (UMF 155); (3) SkyWest would be required to increase its airfares in response to the labor costs, (UMF 156); (4) if SkyWest's carrier-contract partners refused to renegotiate to account for increased labor costs, SkyWest likely would not renew those carrier-contracts, (UMF 157); (5) increased operational costs, including labor and fuel, would increase airfares and threaten service on prorated flight routes to smaller communities, (UMF 164-65); (6) SkyWest has discontinued prorated flight routes into its Modesto, CA and Yuma, AZ stations because of increased costs, and no air carrier has taken over those routes, (UMF 166-70); and (7) high labor costs have led SkyWest to discontinue service on

routes to 16 stations across 11 states, (UMF 89).

Blackwell does not controvert this evidence, choosing instead to advance a "cost of doing business" argument and to suggest that if SkyWest cannot profitably compete while complying with California wage and hour laws, it could always file for bankruptcy or "cease[] to exist all-together." (Opp. at 27.) She cites to *Air Transport Assoc. of America, Inc. v. City and County of San Francisco,* which held that a municipal ordinance, which required air carriers not to discriminate in the provision of benefits, was not preempted by the ADA. 266 F.3d 1064, 1073 (9th Cir. 2001). *Air Transport* is distinguishable, however, because the ordinance did not compel or bind carriers to a particular price, route, or service. *Id.* at 1074. Additionally, the air carriers conceded that they would "lease airport property in San Francisco regardless of the [o]rdinance" because "competitive demands and the economic commitments made to respond to those demands" meant that they were committed to San Francisco. *Id.* Here, SkyWest is arguing that it will be forced to increase prices and reduce, or eliminate, routes if state wage and hour claims like Blackwell's are applied to it.

The Deep Vein Thrombosis cases are instructive. The Fifth Circuit held in *Witty v. Delta Air,* that the ADA preempted a Deep Vein Thrombosis state tort law claim because enforcement of such claims would result in higher prices, due to air carriers providing greater leg room and less seats per flight. 366 F.3d 380, 383 (5th Cir. 2004). *Witty* was cited with approval by the Ninth Circuit in *Montalvo*, but it remanded the ADA preemption issue for further development of the factual record. 508 F.3d at 468-69. Here, the factual record here is robust and uncontroverted. The application of state wage and hour claims to SkyWest means that, to retain profitability, it will have to pass labor costs on to the consumer. (UMF 155-57, 166-65.) As demonstrated by SkyWest's experience in Modesto, CA and Yuma, AZ, increased prices result in lower ticket sales, making regional stations unprofitable and prompting carriers to discontinue routes. (UMF 166-70.) These are not isolated occurrences. SkyWest has already discontinued service on routes to 16 other stations because of increased labor costs. (UMF 59.) Thus, smaller communities are likely to lose access to air transportation because increased labor costs will force carriers like SkyWest to price flights above what the market will bear and, ultimately, discontinue routes to those communities. (UMF 164-65.) Consequently, enforcing the state laws at issue here would prompt the "forbidden significant effect"

1    on air carriers' services, prices, and routes that the ADA seeks to avoid.  *Morales*, 504 U.S. at 388.

2    Accordingly, the ADA preempts Blackwell's fourth and fifth claims.[5]

3    **E.    Issue 16: Applicability of Offset to Sixth Claim for Relief**

4        In her sixth claim, Blackwell seeks to recover $354.55 in unauthorized payroll deductions

5    pursuant to Cal. Labor Code § 221 (employer may not collect or receive wages paid to employee by

6    employer) and § 224 (employer may withhold wages if authorized by employee).   (FAC ¶¶ 66-75.)

7    During her employment, Blackwell received travel benefits from SkyWest, and the costs associated

8    with the benefits were deducted directly from her paychecks.  (Blackwell Decl. ¶50.)  Blackwell

9    alleges that those deductions did not comply with California law because she did not provide written

10   authorization for each such deduction.  (FAC ¶72.)

11       SkyWest argues that the payroll deductions were authorized and the deductions were used to

12   pay for travel benefits provided to Blackwell, which have a retail value of $15,895.80.   (Mot. at 37-

13   38.)  For purposes of this motion, however, SkyWest seeks a legal determination that it is entitled to

14   offset the cost of Blackwell's travel benefits against recovery of the purportedly unauthorized

15   deductions, because Blackwell's recovery would amount to unjust enrichment. (*Id.* at 37.)

16       The Court disagrees.  "The right to offset is a long-established principle of equity." *Carmel*

17   *Valley Fire Protection Dist. v. California*, 190 Cal.App.3d 521, 550 (Cal.App. 2 Dist.,1987).  "Either

18   party to a transaction involving mutual debits and credits can strike or balance, holding himself owing

19   or entitled only to the net difference."  *Id.*  Offset, sometimes called setoff, "allows entities that owe

20   each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of

21   making A pay B when B owes A.'"  *Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (U.S. 1995) (*quoting*

22   *Studley v. Boylston Nat. Bank,* 229 U.S. 523 (1913)).   SkyWest is correct that this Court may

23   determine at summary judgment stage whether its twenty-eighth affirmative defense of setoff is

24   applicable to Blackwell's sixth claim for relief.  *See LACERA* v. *Towers, Perrin, Forster & Corsby,*

25   *Inc.*, 2002 U.S. Dist. LEXIS 27916 (C.D. Cal. June 20, 2002) ("there is no requirement that the claim

26   capable of being set off (against the claim brought by the adverse party) be reduced to a judgment

27   _____

28       [5] Because Blackwell's third, fourth and fifth claims are dismissed for the reasons set forth
     above, the Court does not reach SkyWest's field preemption and dormant commerce clause arguments
     (issues 10-15).

1  before a party may assert the right to set off"). However, "the general rule is that a setoff must rest on

2  a claim enforceable in its own right." *R.M. Sherman Co. v. W.R. Thomason, Inc.*, 191 Cal.App.3d 559,

3  563 (1st Dist.1987). Here, SkyWest is not alleging that Blackwell owes money for travel benefits

4  received. Moreover, given SkyWest's argument that Blackwell's travel is a work-related benefit, and

5  she has been fully compensated for all of the hours she worked as reflected in its pay records, it is

6  dubious whether SkyWest possess an enforceable claim in its own right.

7  Even if SkyWest possessed an enforceable claim, the right to offset is not absolute, and may

8  not be permitted when it would be inequitable or contrary to public policy. *Fed. Deposit Ins. Corp.*

9  *v. Bank of America Nat. Trust and Sav. Ass'n*, 701 F.2d 831, 836-37 (9th Cir.1983). California's Labor

10  Code, including sections 221 and 224, evidence a "fundamental and substantial public policy

11  protecting an employee's wages, and that protection includes freedom from setoffs." *Phillips v.*

12  *Gemini Moving Specialists*, 63 Cal. App. 4th 563, 574 (Cal. App. 2d Dist. 1998). Accordingly,

13  SkyWest has not met its burden of proving entitlement to offset any unauthorized payroll deductions.

14  **F.    Issues 17 and 18: Violation of California Labor Code § 203**

15  Blackwell alleges in her seventh claim for relief that SkyWest owes her "waiting time

16  penalties" under Cal. Labor Code section 203. SkyWest allegedly willfully failed to pay wages due

17  at the time Blackwell's employment ceased. (FAC ¶¶76-83.) Under section 203, an employer may

18  be penalized for willful failure to timely pay a discharged or quitting employee in the amount of the

19  employee's wages due. The waiting time penalties are derivative of Blackwell's other claims. (Mot.

20  at 39; Opp. at 39.) Accordingly, because Blackwell's third, fourth, and fifth claims are preempted by

21  federal law, she cannot recover waiting time penalties for those claims. However, waiting time

22  penalties remain available under Blackwell's first and second claims.

23  SkyWest argues it is entitled to a complete defense to waiting time penalties. As used in

24  section 203, "willful" means "that an employer has intentionally failed or refused to perform an act

25  which was required to be done." *Barnhill v. Robert Saunders & Co.*, 125 Cal.App.3d 1, 7–8 (1981).

26  A good faith dispute over wages will preclude imposition of waiting time penalties under section 203.

27  *Id.* at 8-9. California regulations memorialize *Barnhill's* holding:

28  A 'good faith dispute' that any wages are due occurs when an employer presents a
defense, based in law or fact which, if successful, would preclude any recover on the

- 27 -

1    part of the employee.  The fact that a defense is ultimately unsuccessful will not
2    preclude a finding that a good faith dispute did exist.  Defenses presented which, under
     all the circumstances, are unsupported by any evidence, are unreasonable, or are
3    presented in bad faith, will preclude a finding of a 'good faith dispute.' "

4    Cal. Code Regs., tit. 8, § 13520.

5    Considering the evidence in the light most favorable to Blackwell, the Court finds that a

6    genuine issue of material fact exists as to whether SkyWest acted wilfully when it failed to pay

7    Blackwell's straight time and minimum wages under her first and second claims.  As discussed,

8    Blackwell contends that SkyWest required her to work off the clock, SkyWest utilized an automatic

9    device that recorded a 30 minute meal period regardless of whether or when she took it, SkyWest did

10   not have a procedure to accurately reflect when employees in fact worked through meal periods,

11   SkyWest had notice of Blackwell's complaints, and SkyWest failed to fully investigate her complaints.

12   *See* Part IIIA, above.  SkyWest's motion for summary adjudication is therefore denied on this claim.

13   **G.     Issue 19: Violation of California's Unfair Business Practices Laws**

14   Blackwell contends in her eighth claim that SkyWest's failure to pay her various wages amount

15   to an unfair, unlawful or deceptive business practice under California's Unfair Business Practices Act,

16   Bus. & Prof. Code section 17200.  (FAC 84-95.)  It is settled that the ADA preempts this claim.  *See*

17   *Fitz-Gerald,* 155 Cal.App.4th at 423; (ADA preempts California Unfair Business Practices Act);

18   *Morales*, 504 U.S. at 389 (ADA preempts Texas consumer protection statute); *Wolens,* 513 U.S. at

19   228 (ADA preempts Illinois' consumer fraud act).

20                                    **IV.**

21                               **CONCLUSION**

22   For the reasons set forth above, the Court denies SkyWest's motion for summary judgment and

23   grants in part and denies in part its motion for summary adjudication.  Specifically, the Court rules as

24   follows:

25   (1)     The Motion is DENIED with respect to Issues 1 and 2.  Genuine issues of material fact

26   exist as to whether SkyWest paid Blackwell for all hours worked, and Blackwell has produced

27   sufficient evidence of damages, thereby precluding summary adjudication of these claims.

28   (2)     The Motion is GRANTED with respect to Issues 3 and 4.  The third claim for relief is

without merit because Wage Order 9 specifically exempts SkyWest from paying daily overtime to Blackwell when, as here, she is an employee covered by the SAFA-SkyWest CBA pursuant to the RLA.

(3)     The Motion is GRANTED with respect to Issues 5-7.  The RLA preempts Blackwell's third, fourth, and fifth claims because the Court would be required to interpret the SAFA-SkyWest CBA to resolve her claims.

(4)     The Motion is GRANTED with respect to Issues 8 and 9 as the ADA preempts Blackwell's fourth and fifth claims.

(5)     The Motion is DENIED with respect to Issue  16.  SkyWest has failed to establish it is entitled to offset travel benefits received by Blackwell.

(6)     The Motion is GRANTED with respect to Issue 17 because Blackwell's seventh claim for violations of Labor Code Section 203 cannot be premised on her third, fourth, and fifth claims, and is DENIED to the extent that it is premised on her first and second claims for relief.

(7)     The Motion is DENIED with respect to Issue 18 because genuine issues of material fact exist as to whether SkyWest acted wilfully when it allegedly failed to pay straight time and minimum wages, thereby precluding summary adjudication of SkyWest's good faith dispute defense to Blackwell's seventh claim for relief under Labor Code § 203.

(8)     The Motion is GRANTED with respect to Issue 19 because the ADA preempts Blackwell's eighth claim for unfair business practices.

**IT IS SO ORDERED.**

DATED:  December 3, 2008

_____
HON. DANA M. SABRAW
United States District Judge